UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------- x
WILFREDO GONZALEZ,

                                    Plaintiff,                            07-Civ-2898 (CM) (MHD)

                    - against-

DR. LESTER WRIGHT,
STEVEN SILVER, MD,
SAMUEL LAM, MD
MICHELLE PUTNAM, MD,
JONATHAN SMITH, MD,
AUGUSTINE MOSCATELLO, MD,
WLADYSLAW SIDOROWICZ, MD
S.J. LILLEY, RN/MHSA,
HERBERT GOULDING, MD, and
R. BLAIR, RN/MHSA

                                    Defendants.
------------------------------------------------------- x

```
USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/30/09
```

 DECISION GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

McMahon, J.:

        From about December 6, 2001, until March 21, 2007, plaintiff Wilfredo Gonzalez

-- who is presently a prisoner at Woodbourne Correctional Facility --  suffered from

sinusitis due to a neoseptal deformity.  He brings this lawsuit, *pro se*, pursuant to 42

U.S.C. § 1983, alleging that defendants were deliberately indifferent to his serious

medical needs in violation of his Eighth Amendment right to be free from cruel and

unusual punishment.  He also asserts a claim of medical malpractice under New York

state law against some, but not all, of the defendants for their failure to properly treat his

sinus condition.

        Dr. Lester N. Wright, Dr. Wladyslaw Sidorowicz, Dr. Herbert Goulding, Nurse

Sharon Lilley and Nurse Russell Blair (collectively, "State Defendants") are current or

former employees of the New York State Department of Correctional Services ("DOCS"). Defendants Dr. Steven Silver, Dr. Samuel Lam, Dr. Michelle Putnam (collectively, "Albany Medical Defendants"), as well as Dr. Augustine Moscatello and Dr. Jonathan Smith, are private physicians who, at various points in time, treated plaintiff for his sinus condition.

All of the defendants move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedures. For the reasons that follow, defendants' motions are granted.

### Procedural History

Plaintiff commenced this action on April 11, 2007, by filing a complaint and a request to proceed *in forma pauperis*—although the original complaint is signed and dated January 4, 2007.

On the same day that plaintiff filed this action, my colleague Hon. Kimba M. Wood, who at the time was serving as the Chief Judge of the Southern District, granted plaintiff's request to proceed *in forma pauperis*. Judge Wood also directed plaintiff to submit an amended complaint within sixty days. In reviewing plaintiff's original complaint, the court found that he failed to include allegations about how the named defendants were personally involved in any deprivation of his constitutional rights. The court granted plaintiff "leave to submit an amended complaint detailing his claims regarding what each of the named defendants did or failed to do . . . ." (Docket No. 4 at 2.)

In addition, Judge Wood instructed the plaintiff "to include all of the defendants against whom he intends to assert claims in the caption of the case, and to explain in the

body of the complaint what conduct by each defendant allegedly violated plaintiff's rights," (id. at 3.), because in the original complaint plaintiff made allegations against Dr. Jonathan Smith, but did not name Dr. Smith as a defendant in the action.

On June 4, 2007, plaintiff filed an amended complaint. This case was reassigned to this Court on June 6, 2007.

On August 7, 2007, the Court referred the case to a magistrate judge, Hon. Michael H. Dolinger, for general pretrial, including scheduling, discovery, non-dispositive pretrial motions and settlement. Plaintiff was deposed. He had the services of an interpreter at his deposition.

On December 2 (Dr. Smith), 17 (State Defendants), 18 (Albany Medical Defendants), and 24 (Dr. Moscatello), 2008, the defendants moved for summary judgment. All four motions for summary judgment complied with Local Rule 56.2, pursuant to which a represented party is required to serve and file notice on a pro se party explaining that the *pro se* litigant cannot simply rely on the allegations in his complaint in opposing summary judgment, but must submit some evidence raising issues of material fact for trial.

Plaintiff has never responded to the defendants' motions.

On April 14, 2009, the Court issued an order directing plaintiff to file his responsive papers to defendants' motions within 30 days. (Docket No. 98.) In that order, the Court warned plaintiff that, "Failure to respond to any motion will result in that motion being decided on the merits without the benefit of any input from plaintiff." (Id.)

Plaintiff responded to this Court's April 14th order by writing the Court a letter, dated May 7, 2009. Plaintiff asked that the court reconsider Magistrate Judge Dolinger's

previous decision to deny plaintiff appointment of counsel – at least until he managed to survive a motion for summary judgment – because he was not capable of responding to the motions for summary judgment. Plaintiff alleged that he was "not competent in English reading and writing skills, let alone being competent in the understanding and the application of the law."

On May 21, 2009, the Court denied plaintiff's request for reconsideration, noting  that, "Plaintiff is an articulate individual with some litigation experience.  He is capable of responding to the papers—just unwilling to do so."  (Docket No. 99.) The court notes that, when plaintiff filed this lawsuit, plaintiff also filed an application for appointment of counsel (Docket No. 3), in which he declared "under penalties of perjury" that he spoke English; this contradicts his present assertion that his English is not good enough to permit him to respond to the motion. The record contains many letters that plaintiff claims to have sent to various medical and administrative personnel over the course of the six years encompassed by the conduct challenged in this lawsuit; those letters are written in perfectly satisfactory English, and there is no indication that they were not composed by plaintiff.  Although I am advised by the Magistrate Judge that plaintiff was assisted by an interpreter at his deposition. I cannot conclude, on the record before the court, that plaintiff is incapable of responding to the motion and prosecuting his claims.

In any event, the fact that a pro se litigant has difficulty reading or writing in English, without more, is not a basis for trying to find someone who would represent him without fee in a civil action. The standard for appointing counsel in a civil action (where no such appointment is mandated, and where there are no attorneys on staff to whom

cases can be assigned) requires a plaintiff to demonstrate that his claim has apparent merit.  Hodge v. Police Officers, 802 F.2d 58, 60-62 (2d Cir. 1986).  Only if the claim meets this threshold requirement should the Court then examine secondary factors, such as the indigent's ability to investigate the crucial facts, whether extensive cross-examination will be necessary, the indigent's ability to present the case, the complexity of the legal issues, and any other special reasons.  Id.

Plaintiff has made no such showing. Indeed, as will be apparent from this opinion, in which I dismiss all of plaintiff's claims, the learned Magistrate Judge applied the Hodge rule correctly in this case. Plaintiff's own deposition testimony gives the lie to any suggestion that he was subjected to "medical indifference" in violation of his Eighth Amendment rights, while his malpractice claims (as well as almost all of his Eighth Amendment claims, had he managed to state one against any defendant) are time barred. Thus, it would not serve the interests of justice to appoint counsel; plaintiff's complaint must be dismissed as a matter of law.

## Facts[1]

### A.    The Parties

Plaintiff Wilfredo Gonzalez is an inmate in DOCS custody.  (State Def. Rule 56.1 ¶ 1.)

Defendant Dr. Lester N. Wright is currently employed by DOCS and is the Chief Medical Officer of DOCS Health Services.  (Id. ¶ 2.)

---

[1] The following facts come from defendants' Rule 56.1 Statements, which they submitted pursuant to Local Rule 56.1.  Because plaintiff failed to file any opposition papers, let alone a Rule 56.1 Statement, to defendants' motions for summary judgment, all the averments of fact in defendants' Rule 56.1 Statements—though not the conclusions defendants draw therefrom—are deemed admitted. Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 72 (2d Cir. 2001); Galasso v. Eisman, Zucker, Klein & Ruttenberg, 310 F. Supp. 2d 569, 574 (S.D.N.Y. 2004).

Defendant Dr. Wladyslaw Sidorowicz is a physician at Sullivan Correctional Facility.  (Id. ¶ 3.)

Defendant Nurse Sharon Lilley is a nurse at Sullivan Correctional Facility.  (Id. ¶ 4.)

Defendant Dr. Herbert Goulding is a physician at Mid-Orange Correctional Facility.  (Id. ¶ 5.)

Defendant Nurse Russell Blair was a nurse at Mid-Orange Correctional Facility. (Id. ¶ 6.)

Defendants Dr. Steven Silver, Dr. Samuel Lam, and Dr. Michelle Putnam are surgeons and specialists in otolaryngology.  (Id. ¶¶ 7-9.)  At all times relevant to this action, they were affiliated with Albany Medical Center. (Id.)

Defendant Dr. Jonathan Smith is an Ear, Nose and Throat doctor (also known as an "ENT doctor"), who was affiliated with Westchester Medical Center at all times relevant to this action.  (Id. ¶ 10.)

Defendant Dr. Augustine Moscatello is a surgeon and specialist in otolaryngology.  (Id. ¶ 11.)  Like Dr. Smith, he was affiliated with Westchester Medical Center during the time period relevant to plaintiff's claims.  (Id.)

### B.    Plaintiff's Medical Treatment

#### 1.    Background

Plaintiff has been in DOCS custody since 1983. (Id. ¶ 27.)  During the time periods relevant to this action—2001 to 2007—plaintiff was housed in three different correctional facilities.  On or about October 6, 2000 until October 8, 2002, plaintiff was housed at Sullivan Correctional Facility.  (Id. ¶ 30.)  He then was moved to Mid-Orange

Correctional Facility, where he resided from October 9, 2002 until November 22, 2004. (Id.)  From Mid-Orange Correctional Facility, plaintiff was transferred to Woodbourne Correctional Facility, which is where he presently resides.  (Id. ¶ 28.)

Plaintiff has a history of chronic sinusitis.  (Id. ¶ 15.)  Sinusitis is a condition in which the sinuses are infected or inflamed, producing mucus draining into the nose and sometimes causing congestion.  (Id. ¶ 20.)  Plaintiff's complaints about his condition have been chiefly for nasal congestion and difficulty breathing, which were attributed, in part, to a deviated septum.  (Id. ¶ 16.)  "The ideal nasal septum is exactly midline, separating the left and right sides of the nose into passageways of equal size."  (Id. ¶ 18.) A "deviated septum"occurs when the septum is severely shifted away from the midline." (Id. ¶ 17.)

Generally, chronic sinusitis is treated with antibiotics, decongestants, pain relievers, and/or saline nasal sprays.  (Id. ¶ 21.)  When these treatments repeatedly fail, and the person's sinusitis can in part be attributed to a structural condition, such as a deviated septum, surgery "may be the only alternative" treatment.  (Declaration of Sabrina Jiggetts (hereinafter, "Jiggetts Decl.") Ex. J at 1.)  The preferred surgical treatment to correct a deviated septum is called septoplasty.

Surgery is not a panacea.  "The goal of surgery is to improve sinus drainage and reduce blockage of the nasal passages."  (Id. ¶ 23.)  "Most people have fewer symptoms and better quality of life after surgery."  (Id. ¶ 24.)  However, in a substantial number of people, "problems can recur after surgery, sometime even after a short period of time." (Id.)

### 2.  Plaintiff's Medical Treatment at Sullivan Correctional Facility (October 6, 2000 through October 8, 2002)

On numerous occasions throughout 2001, plaintiff was seen by DOCS Health Services complaining of nasal congestion and difficulty breathing.  (Id. ¶ 33.)  Plaintiff's treating physician at Sullivan Correctional Facility was defendant Dr. Sidorowicz.  (Id. ¶ 31.)  Dr. Sidorowicz prescribed various medications to plaintiff in an effort to treat his sinusitis.  (Id. ¶ 34.)

Defendant Nurse Lilley was one of the nurses who treated plaintiff during this time period.  (Id. ¶ 32.)  She  handled many of plaintiff's requests for medical attention. (Id. ¶ 52.)  Plaintiff testified that Nurse Lilley is named as a defendant in this case because, " she supposedly works jointly with Dr. Sidorowicz," and "she was a nurse in that facility [Sullivan] and she did not bother to solve my problem when she could have helped me."  (Affidavit of Michael T. Snyder (hereinafter, "Snyder Aff.") Ex. L. at 29:22-23; 33:22-25.)

On September 24, 2001, Dr. Sidorowicz referred plaintiff to an outside specialist in otolaryngology, defendant Dr. Lam.  (Id. ¶¶ 35-36.)  Dr. Lam first saw plaintiff on October 19, 2001.  (Id. ¶ 37.)  Based on his assessment of plaintiff's condition, Dr. Lam recommended plaintiff undergo surgery—to wit, a septoplasty.  (Id. ¶¶ 37, 40.)

On October 22, 2001, Dr. Sidorowicz authorized plaintiff's septoplasty. (Id. ¶ 38.)

### a.  Plaintiff's First Surgery (December 6, 2001)

On December 6, 2001, defendants Dr. Lam and Dr. Silver of Albany Medical Center performed surgery, a septoplasty, on plaintiff's nose.  (Id. ¶ 39)  Immediately

following the surgery, Dr. Sidorowicz monitored and treated plaintiff for five days in the "ISU." (Id. ¶ 41.)

After the surgery, plaintiff complained that his "nose was twisted" and that he could not breathe out of the right side of his nose. (Albany Medical Def. Rule 56.1 ¶ 8.) On several occasions after the surgery he went to DOCS Health Services and continued to complain of nasal congestion and obstruction. (State Def. Rule 56.1 ¶ 42.) DOCS Health Services gave plaintiff medications to treat his complaints. (Id. ¶ 43.) Additionally, Dr. Sidorowicz arranged for plaintiff to meet with outside specialists. (Id. ¶ 44.)

Plaintiff saw Dr. Lam on January 25, 2002. (Id. ¶ 45.) Dr. Lam noted that plaintiff continued to complain of persistent nasal obstruction. (Id.)

Plaintiff also complained to DOCS Health Services that the medication Allegra, which was prescribed to treat his congestion, did not work. (Id. ¶ 46.)

In the end, plaintiff's doctors recommended that he undergo a second septoplasty.

### b.    Plaintiff's Second Surgery (March 29, 2002)

On March 29, 2002, defendants Dr. Lam and Dr. Putnam of Albany Medical Center performed a second septoplasty on plaintiff to address his complaints about his nose. (Albany Medical Def. Rule 56.1 ¶¶ 9-11; State Def. Rule 56.1 ¶ 47.) After the surgery, from March 29, 2002 until April 1, 2002, Dr. Sidorowicz monitored and treated plaintiff in the infirmary. (Id. ¶ 48.) Dr. Sidorowicz also scheduled plaintiff to see an outside specialist for follow up visits. (Id. ¶ 49.)

After the procedure, plaintiff continued to complain that his nose was "bent." (Albany Medical Def. Rule 56.1 ¶ 12.)  However, he did not request follow up treatment from Drs. Silver, Lam or Putnam.  (Id. ¶¶ 13-15.)

On May 10, 2002, plaintiff was seen by an outside ENT specialist.  (State Def. Rule 56.1 ¶ 50.)  The ENT, who is not identified in the record, noted that plaintiff continued to complain of "breathing trouble."  (Jiggetts Decl. Ex. N. at 735.)  The ENT, however, concluded that, despite plaintiff's complaints, his current condition might be "as good as we can get."  (Id.)

On or about October 8, 2002, plaintiff was transferred out of Sullivan Correctional Facility to Mid Orange Correctional Facility.  (State Def. Rule 56.1 ¶ 53.) At that point, defendants Dr. Sidorowicz and Nurse Lilley stopped treating plaintiff.  (Id.)

### 3.   Plaintiff's Medical Treatment at Mid-Orange Correctional Facility (October 9, 2002 through November 22, 2004)

When plaintiff was transferred to Mid-Orange Correctional Facility, defendant Dr. Goulding became his treating physician. (Id. ¶ 54.)  Plaintiff was also seen by defendant Nurse Blair, who was a nurse at Mid-Orange Correctional Facility.  (Id. ¶ 55.)

After arriving at Mid-Orange Correctional Facility, plaintiff continued to complain of nasal congestion and difficulty breathing.  (Id. ¶ 56.)  He went to DOCS Health Service on a number of occasions to address his sinusitis, and was treated with a nasal saline spray and other medication.  (Id. ¶¶ 56-57.)

Because plaintiff's chronic sinusitis persisted, he was referred to an outside specialist.  (Id. ¶ 58.)  On November 22, 2002, plaintiff saw defendant Dr. Moscatello, an outside specialist in otolaryngology, who noted that plaintiff's condition appeared to be

improving with nasal sprays.  (Id. ¶ 51.)  During that visit, Dr. Moscatello's notes indicate that plaintiff was "refusing surgery on his nose."  (Jiggetts Decl. Ex. N. at 728.)

On June 3, 2003, plaintiff went to DOCS Health Services for an appointment about his sinusitis.  (State Def. Rule 56.1 ¶ 59.)  During this appointment, plaintiff claimed he was scheduled to have surgery on his nose to correct a deviated septum.  (Id.) The notes from that visit state "he [plaintiff] did not want it [surgery] done in the past— would like to have it [surgery] done now."  (Jiggetts Decl. Ex. N. at 174.)

### a.    Third Surgery (August 25, 2003)

On August 25, 2003, defendant Dr. Moscatello performed rhinoplasty with tip plasty, using sutures, on plaintiff to address his nasal-septum condition.  (State Def. Rule 56.1 ¶ 61; Moscatello Rule 56.1 ¶ 4.)  Dr. Moscatello had no further contact with plaintiff after he performed this surgery.

After the surgery, Dr. Goulding scheduled plaintiff to see an outside specialist for a follow up visit. (State Def. Rule 56.1 ¶ 62.)  On August 29, 2003, plaintiff met with Dr. Meiteles, an outside ENT specialist.  (Id. ¶ 63.)  Dr. Meiteles, who is not named as a party in this action, removed tape from plaintiff's nose and applied an antiseptic cream to his nasal tip.  (Id.)  Plaintiff also was given a saline spray.  (Id.)

When plaintiff left his appointment with Dr. Meiteles and returned to the Mid-Orange Correctional Facility, DOCS medical staff met with plaintiff and instructed him on how to take care of the tape between his nostrils.  (Id. ¶ 64.)  The medical staff also supplied plaintiff with medication.  (Id.)

Plaintiff filed an inmate grievance complaint about his sinus condition and prior surgeries on September 26, 2003.  Plaintiff complained:

> I have not been properly treated for a sinus condition.  Two surgical
> procedures have been performed and they have not only failed to correct
> the condition, but have Exacerbated such.  Mearly [sic] a month after the
> most recent Surgery was performed the sutures remain in place.

(Jiggetts Decl. Ex. B.)

At his deposition, plaintiff testified about why he made the September 26th

grievance:

> I had the stitches there and I couldn't . . . it hurt a great deal when I had to
> wash my face.  Tell her I waited a time.  Dr. Goulding told me to wait
> which was two or three weeks because they are—this type of stitches are
> supposed to be—to disappear.  But I saw that the stitches did not disappear
> and that's when I made my complaint.

(Snyder Aff. Ex. L at 43:8-17.)  He also testified that at some point in time he told

defendant Nurse Blair about the issue with the stitches in his nose.  (Id. at 42:10-12.)

Plaintiff testified that Nurse Blair responded to this complaint by telling him that "the

medical notes, the medical record, did not specify that I had any stitches."  (Id. at 42:21-

23.)  Plaintiff asserts that because Nurse Blair did not do anything about the stitches,

Blair was "negligent and irresponsible."  (Id. at 45:2-3.)

On October 10, 2003, plaintiff went to DOCS Health Services.  During this visit,

he requested to have the sutures in his nose removed.  (Id. ¶ 65.)  Plaintiff's medical

records indicate that he told the staff "The outside hospital said they would remove them

[the stitches] but they never did."  (Jiggetts Decl. Ex. N. at 162.)

On October 15, 2003, plaintiff wrote a letter to defendant Dr. Wright complaining

about his medical treatment at Mid-Orange Correctional Facility:

> On 8/25/03 a surgical procedure was performed to correct errors incurred
> in a prior procedure conducted to correct a sinus problem.  This second
> attempt at correcting complications sustained as a result of the first
> procedure actually exacerbated my condition.  To illustrate the point,
> sutures used in the second surgery still remain in position.

> Although I have questioned the removal of said sutures directing my
> concern to the medical staff at a sick call visit their only action has been a
> response of "you have no sutures." This incredible as it may seem as they
> are clearly visible by the naked eye under the most cursory examination.
>
> ***
>
> Hence, my undertaking herein with the hopes of enlisting your authority
> and therefore respectfully urge that you direct the Medical unit here at
> Mid-Orange to arrange an appointment with a specialist . . . .

(Jiggetts Decl. Ex. F.)

Regional Health Services Administer Marjorie Byrnes, on behalf of Dr. Wright,

responded to plaintiff's letter on October 29, 2003:

> The Division of Health Services has investigated your concerns with the
> health staff at the Mid-Orange Correctional Facility. I have been informed
> that a consult has been submitted by your primary care provider for your
> follow up visit to the ENT specialist. During this visit, the specialist will
> determine when the sutures will be removed.
>
> It is suggested that you continue to bring your concerns to the attention of
> the health care staff using the existing sick call procedures. I am confident
> they will make every effort to address your needs.

(Id.)

Eventually, Dr. Goulding scheduled plaintiff to see an outside specialist to

remove the stitches. (State Def. Rule 56.1 ¶ 66.)

On November 20, 2003, an outside specialist removed the sutures in plaintiff's

nose and provided him with medication. (Id. ¶ 67.)

After the third surgery, plaintiff continued to visit DOCS Health Services for his

sinus problems. (Id. ¶ 69.) During this time period, DOCS Health Services provided

plaintiff with various medications to treat his chronic sinusitis. (Id. ¶ 70.)

On January 29, 2004, Dr. Goulding scheduled plaintiff to see another outside

specialist. (Id. ¶ 71.) Plaintiff met with defendant Dr. Smith, an ENT specialist, at

Mount Vernon Hospital on February 27, 2004. (Id. ¶ 72.) Dr. Smith recommended that

plaintiff receive a steroid spray and saline application, and that plaintiff be referred to an

Allergist for an evaluation. (Id.) He also requested that plaintiff come back for a follow

up appointment in two months. (Id.)

On March 8, 2004, Dr. Goulding scheduled an appointment for plaintiff to see an

Allergist, Dr. Hugh, on March 25, 2004. (Id. ¶ 74.)  At that appointment, Dr. Hugh

recommended plaintiff receive a nasal steroid spray and decongestant medication. (Id.

¶ 74.)

Dr. Smith saw plaintiff on two more occasions: May 14, 2004, and June 11, 2004.

(Smith Rule 56.1 ¶ 3.) At the June 11th visit, Dr. Smith learned that plaintiff was seen by

another otolaryngologist, Dr. Meiteles, on May 21, 2004. (Affidavit of Jonathan Smith,

M.D. (hereinafter, "Smith Aff.) at 3.) The purpose of the June 11th visit was to

reevaluate plaintiff's condition. (Id. at 5.) Plaintiff asserts that the purpose of the visit

was to perform another surgery, which he claims Dr. Smith refused to do.  After the visit,

Dr. Smith recommended the following to DOCS Health Services:

> Patient is currently being seen by myself, Dr. Jonathan Smith, and by Dr.
> Lawrence Meiteles, both ENT doctors. As stated above, under reason for
> consult, I requested a CT scan of the maxillary sinus to evaluate for left
> facial pain and possible fullness of the left maxillary process around the
> 2nd and 1st maxillary molars on 5/14. I also requested a copy of
> audiogram on 5/11. I see that Dr. Meiteles has already seen the audiogram
> and is currently working this up; seen on 5/21/04. I think it would be best
> if Dr. Meiteles or I follow the patient, not both. If I am to see the patient, I
> would like to have the above CT scan of the maxillary sinus (similar scan
> also ordered of temporal bone by Dr. Meiteles), audiogram, blood work
> ordered on 5/21. If Dr. Meiteles is to follow patient, please provide him
> with this note and my other notes.  Please call . . . .

(Jiggetts Decl. Ex. N at 645.)

Throughout the remainder of plaintiff's time at Mid-Orange Correctional Facility, Dr. Goulding referred plaintiff for follow up visits to meet with outside specialists to address his chronic sinusitis.  (Id. ¶ 75.)  Plaintiff also continued to receive medication to treat his symptoms.  (Id. ¶ 76.)

Plaintiff was transferred out of Mid-Orange Correctional Facility to Woodbourne Correctional Facility on or about November 22, 2004.  (Id. ¶ 78.)  After this transfer, Dr. Goulding and Nurse Blair were no longer involved in plaintiff's treatment.

### 4. Plaintiff's Medical Treatment at Woodbourne Correctional Facility (November 23, 2004 through March 21, 2007)

Plaintiff continued to receive treatments for his chronic sinusitis when he arrived at Woodbourne Correctional Facility.

On November 3, 2006, plaintiff filed an inmate grievance complaint against defendant Dr. Smith.  In relevant part, the complaint provides:

> On June 11, 2004, Dr. Jonathan Smith was due to performe [sic] surgery on my right nasal area, Septoplast, Rhinoplasty . . . . Dr. Smith and I got into a heated disagreement due to my continuing to suffer pain and difficulty breathing.  Dr. Smith took it upon himself to tell me that the facility health service director had written in my records that I was a troublemaker who did nothing but complain.  I told hime [sic] that it was none of his business, all he should be concerned with is treathing [sic] my injury.  Mr. Smith got upset and denied me treatment.  My injury exacerbated and I realized that this was a pattern of denial of treatment.
>
> Now, I am experiencing the same thing here at Woodbourne.  I cannot breath at night and it causes me problems sleeping.  I go to sick call because my right nostril is nearly closed and I would like to have an outside specialist consultation to check and see if the pain can be alleviated.

(Jiggetts Decl. Ex. B.)

On November 7, 2006, plaintiff wrote to Dr. Wright to complain about "Serious Medical Indifference."

I'm contacting your office because of the pain and suffering that I am experiencing due to a botched surgical procedure of my right nasal cavity at Albany medical Center South Clinical Campus on December 6, 2001. Because of the ramifications of such surgery, I continue to have difficulty breathing while I sleep.

I have written several grievances, attended sick call and complained to staff at every facility that I have been in during this time such as Sullivan, Mid-Orange and Woodbourne Correctional Facility to no avail.  My right nasal passage is blocked and causes migraine headaches.  I have consulted the medical staff, here at Woodbourne, about my being examined by an outside specialist for consultation and possibly a radical surgical procedure to correct this matter.  I have been wrongfully accused of being a troublemaker because of my relentlessness, thus, hindering my attempts to receive treatment.  Therefore, the staff deliberately denies me much needed treatment that is proving to be detrimental to my health.

Moreover, I am contacting your office in hope that your professional supervision of the medical staff at Woodbourne would be enough to be provided with the much-needed treatment of my serious injury.  I felt it necessary to contact your office before I resulted to the Federal District Court for the deliberate indifference that I continue to experience.

(Jiggetts Decl. Ex. E.)

On November 16, 2006, the grievance committee responded to plaintiff's complaint against Dr. Smith.  The committee found plaintiff's complaint to be "unsubstantiated."  (Jiggetts Decl. Ex. B.)  "Per 6/11/04 ENT Consult, Grievant was not denied treatment.  MD stated he was being followed by 2 ENT DRS in clinic & he should be followed by one."  (Id.)

On December 6, 2009, Dr. Wright's office responded to plaintiff's letter.  Pedro Diaz, the Regional Health Services Administrator, wrote:

Dr. Wright has asked me to respond to your correspondence dated November 7, 2006.

The Division of Health Services has investigated your concern regarding your allegation that you are being denied necessary medical treatment.  You have been seen and evaluated by the facility physician, who has referred you for diagnostic evaluative test and to a consultant specialist.

> As soon as the results of the diagnostic test are reviewed, they will determine the need for the specialist. It appears that your medical needs are getting appropriate attention.
>
> The facility health services director is the final arbiter of medical decisions affecting the health care of inmates under their care.

(Jiggetts Decl. Ex. E.)

### a.    Fourth Surgery (March 21, 2007)

On March 21, 2007, plaintiff underwent a fourth operation on his nasal septum. (Smith Rule 56.1 ¶ 5.) The surgery was performed by Dr. Arthur Falk. (Snyder Decl. Ex. L. at 117:9-12.) Plaintiff testified that Dr. Falk fixed his nose. (Id. at 117:19-21.)

On August 9, 2007, x-rays of plaintiff's sinuses were taken. The x-ray revealed, "normal development and aeration paranasal sinuses with no fluid levels, bone destruction or abnormal soft tissue masses. Nasal septum near midline. Mastoids are well aerated bilaterally. NO EVIDENCE OF SINUSITIS." (Jiggetts Decl. Ex. N. at 497.)

### C.    Plaintiff's Prior Lawsuits

Prior to the present action, plaintiff had filed two state court lawsuits against the State of New York. (Jiggetts Decl. Ex. G, H.) Both lawsuits involved the same facts at issue in this case. Plaintiff testified:

> A. I have been in the matter of this same lawsuit because I have filed it twice with the State.
>
> Q. So the same facts that we are here for today you filed a lawsuit before; is that correct?
>
> A. Yes.
>
> Q. You filed that with the State?

17

> A. Tell her that I represented it with the State but that the court ignored
> my reasons.  Thus, I saw myself having the necessity to file them in
> the Federal Court.

(Snyder Aff. Ex. L. at 15:16-16:3.)

In 2006, plaintiff filed a claim for negligence and medical malpractice against the

State of New York in the New York State Court of Claims, Gonzalez v. The State of New

York, #2006-016-063, Claim No. 108549.  (Jiggetts Decl. Ex. G.)  Plaintiff alleged:

> following an August 25, 2003 surgery on his nose (apparently at
> Westchester Medical Center), personnel at Mid-Orange Correctional
> facility failed to provide him with adequate treatment for pain, and further
> failed to remove "non-dissolvable" stitches from the surgery in a timely
> manner.
>
> Claimant testified that the surgery was for sinus problems, i.e., because he
> had difficulty breathing.  He recalled that he had four to six stitches in his
> nose following the surgery, and that the stitches were not removed for 58
> days.
>
> Asked about his condition as of the time of trial, claimant said it was "still
> bad . . . I still have [the] problem . . . I . . . have no attention for my nose
> problem."  He added that his voice had changed following the surgery.

(Id.)  On September 26, 2006, the Honorable Alan C. Marin dismissed plaintiff's claim

because he failed to provide expert testimony demonstrating that the State deviated from

the accepted standards of medical care in providing plaintiff with treatment for his

condition.  Id.

In 2008, plaintiff filed another lawsuit in the New York Court of Claims against

the State of New York, Gonzalez v. The State of New York, #2008-016-013, Claim No.

107490, alleging that the State deviated from accepted medical practices following

plaintiff's December 6, 2001 surgery.  (Jiggetts Decl. Ex. H.)  Plaintiff alleged:

> on December 7, 2001, he advised staff at Sullivan Correctional Facility
> "that the surgery . . . to Claimant's nasal canal had not been successful and
> that he was still suffering from pain and bleeding," and that the medical

staff "refus[ed] to treat Claimant's serious medical needs." Mr. Gonzalez
further alleges that he has "suffered permanent disabilities including
chronic loss of breathing ability through his nose and . . . change in his
voice.

(Id.)  Judge Marin also presided over this claim, and on March 28, 2008, he dismissed it

because plaintiff failed to show that there were any deviations from accepted standards of

medical care, which proximately caused his injury.  Id.

At plaintiff's deposition, he testified that the two lawsuits were dismissed, "but

right now I have one in appeals, under appeal, in the second or third department."

(Snyder Aff. Ex. L at 16:13-16.)  Plaintiff did not indicate which of the two lawsuits he

had appealed.

## Discussion

### I.      Standard of Review

A party is entitled to summary judgment when there is no "genuine issue of

material fact" and the undisputed facts warrant judgment for the moving party as a matter

of law.  Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).  In

addressing a motion for summary judgment, "the court must view the evidence in the

light most favorable to the party against whom summary judgment is sought and must

draw all reasonable inferences in [its] favor."  Matsushita Elec. Indus. Co. Ltd. v. Zenith

Radio Corp., 475 U.S. 574, 587 (1986). Whether any disputed issue of fact exists is for

the court to determine.  Balderman v. United States Veterans Admin., 870 F.2d 57, 60

(2d Cir. 1989).  The moving party has the initial burden of demonstrating the absence of a

disputed issue of material fact.  Celotex v. Catrett, 477 U.S. 317, 323 (1986).  Once such

a showing has been made, the non-moving party must present "specific facts showing

that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).  The party opposing

summary judgment "may not rely on conclusory allegations or unsubstantiated speculation." Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998).

Moreover, not every disputed factual issue is material in light of the substantive law that governs the case. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude summary judgment." Anderson, 477 U.S. at 248. Finally, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586. To withstand a summary judgment motion, sufficient evidence must exist upon which a reasonable jury could return a verdict for the nonmovant.

When the nonmoving party is *pro se*, the Court judges its pleadings by a more lenient standard than that accorded to "formal pleadings drafted by lawyers." Haines v. Kerner, 404 U.S. 519, 520 (1972). Proceeding *pro se*, however, "does not otherwise relieve [plaintiffs] from the usual requirements of summary judgment." Fitzpatrick v. The N.Y. Cornell Hosp., 00 Civ. 8594, 2003 WL 102853, at *5 (S.D.N.Y. Jan. 9, 2003) (citing cases).

## II.    Statute of Limitations

### A.    Section 1983

#### (i)    Plaintiff's claim is really for medical malpractice, and so is not actionable under Section 1983.

The Eighth Amendment "imposes a duty on prison officials to ensure that inmates receive adequate medical care." Salahuddin v. Goord, 467 F.3d 263, 279 (2d Cir. 2006) (citing Farmer v. Brennan, 511 U.S. 825, 832 (1994)). Courts use a two-pronged test to determine whether this right has been violated. See Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998).

First, the deprivation of care must be "sufficiently serious." Id.; see also Farmer, 511 U.S. at 825. This requirement is objective, and is analyzed using a two-part inquiry. Initially, the Court must determine whether the inmate was actually denied adequate care. See Salahuddin, 467 F.3d at 279-80. Prison officials are not obligated to provide inmates with whatever care the inmates desire. Rather, prison officials fulfill their obligations under the Eighth Amendment when the care provided is "reasonable." Id. at 280 (citing Farmer, 511 U.S. at 844-47.

If the care provided was unreasonable, courts must ask whether that inadequacy was "sufficiently serious." Id.; see also Smith v. Carpenter, 316 F.3d 178, 185-86 (2d Cir. 2003). "Factors relevant to the seriousness of a medical condition include whether 'a reasonable doctor or patient would find [it] important and worthy of comment,' whether the condition 'significantly affects an individual's daily activities,' and whether it causes 'chronic and substantial pain.'" Salahuddin, 467 F.3d at 280 (quoting Chance, 143 F.3d at 702). This analysis requires an examination both of the harm already caused to the prisoner and the likelihood that harm will continue or increase without additional treatment. See id. Thus, the "seriousness" inquiry will vary based on the nature of the treatment provided and the claim asserted by the inmate. See id.

The second component is subjective; it requires that the prison official involved act with a "sufficiently culpable state of mind." Id. (citing Wilson v. Seiter, 501 U.S. 294, 298 (1991)). This is satisfied by a showing that the official acted with "deliberate indifference" toward the plaintiff's health, a state of mind akin to criminal recklessness. Id. "This mental state requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." Id.

Finally, this mental state is not satisfied by an inadvertent failure to provide adequate medical care.  Estelle v. Gamble, 429 U.S. 97, 105-06 (1976).  "Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim . . . .  In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs."  Id.

Finally – and of great importance for our purposes, "The prisoner's right is to medical care—not the type or scope of medical care which he personally desires.  A difference of opinion between a physician and a patient does not give rise to a constitutional right or sustain a claim under § 1983."  United States ex rel. Hyde v. McGinnis, 429 F.2d 864, 867-68 (2d Cir. 1970) (quoting Coppinger v. Townsend, 398 F.2d 392, 394 (10th Cir. 1968)); Chance, 143 F.3d at 703.

Plaintiff alleges that defendants were deliberately indifferent to his medical needs, in violation of the Eighth Amendment, because they "poorly performed otolaryngological surgeries . . . [and] knew that plaintiff's heightened injury was due to their collective mishandling his serious medical condition and medical care."  (Am. Compl. at 5.)

It seems obvious that plaintiff's claim is really one for malpractice.  "Malpractice claims cannot be brought under Section 1983, because they sound in negligence, and mere negligence does not rise to the level of a constitutional tort."  Benjamin v. Galeno, 415 F. Supp. 2d 254, 256 (S.D.N.Y. 2005).

However, conscious of the need to read a pro se plaintiff's claims generously, and lacking any response from plaintiff to the motions, the court has reviewed, not only plaintiff's amended complaint, but also his deposition testimony and his letter of May 7,

2009, in which he (or whoever wrote the letter on his behalf) describes the essence of

what he means by "deliberate indifference" – which is that the defendants collectively

and deliberately mishandled his medical condition by taking what he describes as the

"medically 'easy way out:.'"

> Two surgeries were performed on the same site to correct the
> same condition. One physician was present during both procedures.
> During the first surgery, no connective tissue was harvested to
> adequately support the affected area of my nasal septum. These
> surgeries failed. Months later, my respiratory condition was
> corrected for the most part by the transplantation of connective tissue.

(Docket No. 99). Clearly, plaintiff is contending that the medical personnel committed

malpractice by failing to perform an operation that transplanted sufficient connective

tissue – not that they were indifferent to his medical condition. His complaint is that,

*despite a massive amount of attention*, including no fewer than four surgeries and

repeated treatments with sprays, nasal steroids, antibiotics and other medications, his

chronic sinusitis was not fixed until 2007, when he had his fourth and final septoplasty.

But that is a malpractice claim – not a deliberate indifference claim.

Moreover, the voluminous medical records submitted by all of the defendants in

connection with their respective motions give the lie to any suggestion that they were

indifferent – deliberately or otherwise – to plaintiff's condition.  The records show that

plaintiff received extensive medical treatment for his sinus condition throughout the

period encompassed by this lawsuit. There is simply nothing in the record to support

plaintiff's claim that his medical needs were ignored.

In Fox v. Fisher, 04 Civ. 6718, 2005 WL 1423580 (S.D.N.Y. June 14, 2005),

aff'd 242 Fed. Appx. 759, 2007 WL 2089967 (2d Cir. July 20, 2007), my former

colleague, The Hon. Michael Mukasey, dismissed a prisoner's complaint because he

failed to show he received inadequate medical care.  In that case, too, the prisoner

suffered from a chronic sinus condition.   He alleged that his doctors and DOCS deprived

him of medical care by failing to provide him with certain treatments for his condition

(e.g., treatments by specialists and prescriptions for certain drugs).  The court held:

> Fox has no cognizable Eighth Amendment claim. By Fox's own
> admission, he received extensive medical treatment for his sinus and ear
> problems: He saw two E.N.T. specialists; he used the sick call procedure
> regularly; he was given two courses of antibiotics; a set of x-rays was
> taken and he received a hearing test; he took three prescription
> medications; he had his ear drained by an E.N.T.; and he had a drainage
> tube placed in his ear. Unfortunately, *Fox's pain and hearing loss
> persisted despite this treatment, but such is sometimes the nature of sinus
> disorders. Defendants were far from deliberately indifferent to Fox's
> medical needs; arguably, they provided him with more care than the
> average non-incarcerated individual with sinus problems would receive.* If
> Fox did suffer hearing loss as a result of his condition, as he alleges, he
> may have a medical malpractice claim, which he may pursue in state
> court. But the treatment he received at Sing Sing was more than adequate
> to satisfy Eighth Amendment standards.

Id. at *3 (emphasis added).

On the undisputed facts recited above, I reach the same result here. Beginning in

2001, plaintiff received a variety of treatments (multiple surgeries, referrals to specialists,

numerous prescriptions and other therapies) for his chronic sinus condition.

Unfortunately, even after receiving this care, plaintiff's sinus condition persisted – which

is not unknown to sinus sufferers.  But this does not establish that any of the defendants

were deliberately indifferent to plaintiff's situation. At most it would tend to show that

defendants were inept, which is to say, that they committed malpractice. Once again,

malpractice is not actionable under Section 1983.

> **(ii)**     **Either Because of the Statute of Limitations or Because There
> is No Evidence of Deliberate Indifference, Any Section 1983
> Claim Plaintiff Might Have Managed to State Must be
> Dismissed**

The fact that plaintiff's complaint does not really sound in deliberate indifference, but rather in medical malpractice, makes it technically unnecessary to consider any of the other issues raised by defendants' motions for summary judgment dismissing plaintiff's federal constitutional claim.  But in an excess of caution I will address two of those issues: limitations bars any Section 1983 claim as to all defendants except Dr. Smith and possibly Dr. Goulding – and as to claims against those two physicians, they are unsupported by any evidence.

All of the defendants assert that plaintiff's section 1983 claim should be dismissed as untimely.

An Eighth Amendment deliberate indifference claim is considered to be a personal injury action.  See Shomo v. City of New York, --- F.3d. ----, 2009 WL 2767032, at * 2 (2d Cir. 2009).  In New York, the statute of limitations for personal injury actions brought pursuant to 42 U.S.C. § 1983 is three years.  Owens v. Okure, 488 U.S. 235, 250-251 (1989); Shomo, --- F.3d at ----, 2009 WL 2767032, at *2.  "A Section 1983 claim ordinarily 'accrues when the plaintiff knows or has reason to know of the harm.'"  Shomo, --- F.3d at ----, 2009 WL 2767032, at *2 (quoting Eagleston v. Guido, 41 F.3d 865, 871 (2d Cir.1994)).  Delay in discovering the cause of the injury does not prevent the claim from accruing—"In applying a discovery accrual rule, we have been at pains to explain that discovery of the injury, not discovery of the other elements of a claim, is what starts the clock."  Rotella v. Wood, 528 U.S.549, 555 (2000).

Nearly every discrete action of which plaintiff complains took place more than three years before he commenced this lawsuit. The only exception to that is Dr. Smith's refusal to operate on plaintiff on June 11, 2004 – which, according to plaintiff, was

occasioned by Dr. Goulding's note in the medical file referring to plaintiff as a "troublemaker."

So the court will consider whether there has been a continuing violation that would bring the various defendants other than Drs. Smith and Goulding within the ambit of the statute of limitations.

The continuing violation doctrine acts as an exception to the normal accrual date calculation in section 1983 cases. Shomo, --- F.3d at ----, 2009 WL 2767032, at *2. This doctrine, which is typically applied in discrimination cases, provides "the commencement of the statute of limitations period may be delayed until the last [wrongful] act in furtherance of it." Id.

In Shomo, supra, the Second Circuit addressed whether the continuing violation doctrine applied to Eighth Amendment claims of medical indifference. The court held "that the continuing violation doctrine can apply to Eighth Amendment claims of medical indifference brought under 42 U.S.C. § 1983 when the plaintiff shows an ongoing policy of deliberate indifference to his or her serious medical needs and some acts in furtherance of the policy within the relevant statute of limitations period." Id. at *1.

In that case, plaintiff was diagnosed with right arm paralysis and limited use of his left arm. Id. On September 26, 2003, he filed a *pro se* section 1983 complaint alleging that Department of Corrections' medical personnel and security staff repeatedly refused to offer him assistance with daily living activities, transfer him to a specialized infirmary housing or provide the recommended treatments for his disability. Id. Plaintiff's deliberate indifference theory was that defendants had a policy of disregarding

medical recommendations about his medical needs.  At issue was whether plaintiff's

claim was time-barred.  The court held:

> We agree that the continuing violation doctrine can apply when a prisoner
> challenges a series of acts that together comprise an Eighth Amendment
> claim of deliberate indifference to serious medical needs. That the
> continuing violation doctrine can apply, however, does not mean it must.
> To assert a continuing violation for statute of limitations purposes, the
> plaintiff must "allege both the existence of an ongoing policy of
> [deliberate indifference to his or her serious medical needs] and some non-
> time-barred acts taken in the furtherance of that policy." See Harris, 186
> F.3d at 250. This test screens out Eighth Amendment claims that challenge
> discrete acts of unconstitutional conduct or that fail to allege acts within
> the relevant statutory period that are traceable to a policy of deliberate
> indifference.

Id. at *3.

The court found that plaintiff's section 1983 claims against two doctors and a

physician assistant were time-barred because the continuing violation doctrine did not

apply  Id. at *5. One of the physicians, Francois, had denied plaintiff's request for a

second opinion after an October 13, 1999, medical examination.  The court held that

plaintiff's claim against Francois was time-barred because his decision to deny the

second opinion did not fall within the policy of disregarding medical recommendations.

Id.  On a few occasions, plaintiff was also treated by Dr. Singh.  The court held that, even

if plaintiff's claim against Dr. Singh made out a deliberate indifference claim, it was

time-barred because the last contact Dr. Singh had with plaintiff was outside the statute

of limitations period.  Id.  Finally, plaintiff's complaint against the physician assistant

was time-barred because there were no allegations of any wrongful conduct against the

physician assistant during the statutory time period.  Id.

The Second Circuit's decision to affirm the dismissal of the claims against Dr.

Singh and the physician assistant made clear that in order for the continuing violation

doctrine to apply, plaintiff needed to show that those specific individuals committed at least one wrongful act within the statutory time period.

In this case, plaintiff's theory of deliberate indifference is that the defendants collectively perpetuated an ongoing policy of mishandling his chronic sinusitis and denying him adequate medical treatment.  Even if plaintiff could make out a claim of deliberate indifference under this theory, his claims against defendants Dr. Sidorowicz, Nurse Lilley, Dr. Silver, Dr. Lam, Dr. Putnam, Dr. Moscatello, and Nurse Blair are time-barred. The continuing violation doctrine does not apply, and in any event these defendants' alleged wrongful acts fall outside of the statutory time period.

Plaintiff's original complaint is signed and dated January 4, 2007, although it was not filed with this Court until April 11, 2007.  State defendants assume that the date plaintiff signed the complaint should be used in measuring when the action commenced. Assuming this to be true, plaintiff's claim can only be timely for wrongful conduct dating back to January 4, 2004, unless the continuing violation doctrine applies.[2]

The first thing to note is that the record is devoid of any evidence demonstrating that any of the defendants – who were located at three different correctional facilities and hospitals in Albany, Valhalla and Mt. Vernon – ever coordinated a treatment (or non-treatment) plan for plaintiff, or reached any agreement about how to treat (or not treat) plaintiff's sinusitis. Indeed, it appears that the primary, and perhaps the only, means of communication among all these far-flung medical personnel was via notes contained in plaintiff's medical file. It is, therefore, difficult to understand how plaintiff could possibly make out a "continuing violation" that would encompass all of the defendants in this

---

[2] The Court's analysis would not change if it used the date plaintiff's complaint actually was filed.

action. But even if one could call this course of treatment a "continuing violation," the Section 1983 claim would have to be dismissed against all defendants except Dr Goulding and Dr. Smith, because there is no allegation and no evidence that the rest of the defendants participated in the treatment of plaintiff during the three years that preceded the commencement of this lawsuit.

### 1.    Dr. Sidorwicz and Nurse Lilley

Plaintiff alleges that Dr. Sidorowicz and Nurse Lilley violated his rights because they "knew about the deterioration in the plaintiff's neoseptal area after the first botched operation and did nothing to correct the problem." (Am. Compl. at 3.) The evidence in the record shows that this allegation is not true. After the first surgery, plaintiff continued to complain about his chronic sinusitis, and Dr. Sidorwicz referred plaintiff to a specialist to evaluate plaintiff's complaint. The specialist recommended that plaintiff undergo a second surgery, which Dr. Sidorwicz approved.

However, construing plaintiff's complaint liberally, the gist of his allegations against Dr. Sidorwicz and Nurse Lilley is that they did not take enough steps to correct his medical problems while he was under their care. Even if this allegation constituted a deliberate indifference claim against these defendants, it is untimely.

Defendants' evidence establishes that plaintiff complained about his sinus condition during his entire stay at Sullivan Correctional Facility—thus, he was aware of the problem while he was housed there.

There is no evidence that Dr. Sidorwicz and Nurse Lilley had any involvement with plaintiff's care—or any contact with plaintiff—after he left Sullivan Correctional Facility on October 8, 2002. Plaintiff offers no evidence showing that Dr. Sidorwicz or

Nurse Lilley took "any wrongful acts that could relate to conduct that falls within the statutory time period," <u>Shomo</u>, --- F.3d ----, 2009 WL 2767032, at *5, so they cannot be ensnared in any "violation" that "continued" into the limitations period. Plaintiff's time to bring a section 1983 claim against Dr. Sidorwicz and Nurse Lilley has long since run.

### 2. Albany Medical Defendants

Plaintiff's section 1983 claim against the Albany Medical Defendants relates to the first two surgeries plaintiff received to treat his chronic sinusitis. Dr. Lam and Dr. Silver performed the first surgery on December 6, 2001. This was the last time Dr. Silver had any contact with plaintiff. Dr. Lam and Dr. Putnam performed the second surgery on March 29, 2002, which was the last time they saw plaintiff.

There is no dispute that, after each surgery, plaintiff was aware of his alleged injury. Following both of the surgeries, plaintiff complained that his sinus problems persisted. Accordingly, plaintiff's claim against Dr. Silver accrued on December 6, 2001, and his claim against Drs. Lam and Putnam accrued on March 29, 2002. The continuing violation doctrine does not apply in this instance, because the evidence shows that these defendants stopped having contact with the plaintiff in 2001 and 2002—which is well outside the statutory time period. Therefore, plaintiff's section 1983 claim against the Albany Medical defendants is also time-barred.

### 3. Dr. Moscatello

Dr. Moscatello treated plaintiff on two occasions. On November 22, 2002, Dr. Moscatello examined the plaintiff, noted that his sinus condition appeared to be improving with nasal sprays, and that plaintiff refused to have any further surgery on his nose. On August 25, 2003, Dr. Moscatello performed the third surgery on plaintiff's

nose.  Dr. Moscatello never saw plaintiff against after that surgery, so he did not participate in any "violation" that "continued" into the limitations period. The limitations period against him personally ran in August 2006.

Plaintiff cannot rely on the failure to remove his sutures in a timely way after Dr. Moscatello's operation – which arguably was the surgeon's post-operative responsibility – to bring that defendant within the limitations period under a continung violation theory, because the sutures were removed on November 20, 2003 – two months outside the most generous interpretation of the limitations period.

### 4.    Nurse Blair

Nurse Blair interacted with plaintiff while he was housed at Mid-Orange Correctional Facility.  Plaintiff alleges that during his time there, October 9, 2002 until November 22, 2004, Nurse Blair, together with Dr. Goulding, labeled plaintiff a "chronic complainer," causing him to receive inadequate medical care.  (Am. Compl. at 4-5.) Plaintiff also alleges that Nurse Blair knew about the sutures in his nose after the August 25, 2003 surgery, and did nothing to address the problem for approximately fifty days, until the sutures were finally removed in November 2003  (Id. at 3.)

Plaintiff's section 1983 claims against Nurse Blair are untimely.  Plaintiff alleges that Nurse Blair deliberately denied him care by refusing to take action to have the stitches in his nose removed after the August 25, 2003 surgery.  Since the stitches were removed in November 2003, it was remedied well before the limitations period.

There is no evidence in the record that Nurse Blair ever saw plaintiff after his sutures were removed, so the claims against her are definitely time barred. Plaintiff testified that he named Nurse Blair as a defendant because, "he was not interested in me.

He did not give any importance, any weight, to my complaint. . . .  he was irresponsible because he was supposed to look after my health.  That's why I placed him there . . . ." (Snyder Aff. Ex. L. at 42:3-5; 44:22-25.)  This might be thought to suggest some continuing course of treatment. But plaintiff did not identify a single affirmative act that Nurse Blair either did or refused to do after the contretemps over the removal of the sutures in November 2003.  Indeed, plaintiff did not identify any incident within the limitations period when he saw or spoke to Nurse Blair.  The vague complaint that the nurse was "not interested in me" and "was irresponsible because he was supposed to look after my health" does not satisfy the standard.

### 5. Dr. Goulding

If plaintiff had a viable Section 1983 claim against Dr. Goulding, it would not necessarily be time-barred.

Plaintiff testified that Dr. Goulding denied him medical care "because he saw my condition and he told me that he was unable to do anything."  (Id. at 35:19-21.)  He offers no evidence of what it was that Dr. Goulding felt himself unable to do. A doctor telling a patient that he cannot do anything, without more, does not constitute deliberate indifference, since a physician may well conclude, as a matter of his professional medical judgment, that he can offer no viable course of treatment. Nor does plaintiff identify when Dr. Goulding told plaintiff he could do nothing to assist him; without knowing when this occurred I cannot conclude that it occurred within the limitations period.

However, plaintiff alleges that on June 11, 2004, Dr. Smith said "Get out of my office because you're creating too many problems.  He told me I was a troublemaker."

(Id. at 154:10-12.)  Plaintiff identified Dr. Goulding as the person who told Dr. Smith that he was a troublemaker, thereby causing Dr. Smith to refuse to operate on plaintiff.

Were there were any evidence to support plaintiff's contention, then the three year limitations period would not bar a claim against Dr. Goulding. The problem for plaintiff here is that there is no such evidence.

On November 3, 2006, plaintiff filed a grievance about Dr. Smith's failure to operate on him on June 11, 2004.  In that grievance, plaintiff asserts that Dr. Smith told him "the facility health service director had written in my records that I was a troublemaker who did nothing but complain."  Dr. Goulding was the facility health service director, so he was the person who allegedly wrote in plaintiff's records that plaintiff was a troublemaker.

The grievance committee investigated this complaint and found plaintiff's accusation to be unsubstantiated.  So does this court. There is also nothing in plaintiff's medical records to suggest that Dr. Goulding labeled him a troublemaker; the court did not locate any note in the records to that effect. Therefore, Dr. Goulding would be entitled to dismissal of a Section 1983 claim related to his purported characterization of plaintiff – which turns out to be non-existent.

### 6.    Dr. Smith

Dr. Smith's most recent dealings with plaintiff occurred after January 2004, so the limitations arguments that were successful for other defendants do not apply to him. Nonetheless, he argues that plaintiff's complaint against him should be dismissed on limitations grounds because he was not timely served with the complaint, and the statute had expired as to him by the time he was served. His arguments lack merit.

Plaintiff's original complaint was filed April 11, 2007.  In that complaint, he made allegations against Dr. Smith, but did not name him as a defendant.  Judge Wood directed plaintiff to file an amended complaint.  On June 4, 2007, plaintiff filed an amended complaint naming Dr. Smith as a defendant. Plaintiff's last medical contact with Dr. Smith occurred on June 11, 2004 – less than three years before the date the amended complaint was filed.

On October 30, 2007, the United States Marshal attempted to serve Dr. Smith, but failed.  (See Docket No. 15.)

On January 23, 2008, Magistrate Judge Dolinger conducted a telephone conference with plaintiff and counsel for the defendants who had been served.  That day, Judge Dolinger issued an order, which provides "If plaintiff still wishes to serve the complaint and a summons on defendants Samuel Lam, Jonathan Smith and Michelle Putnam, he must arrange for the United States Marshal or someone else to do so by no later than February 29, 2008.  To assist him in doing so, we direct that the Clerk of the Court forward the necessary three summonses and the appropriate U.S. Marshal's forms to him promptly.  (Docket No. 29.)

On February 13, 2008, an amended summons was issued to Dr. Smith.  The docked indicates that the U.S. Marshal served Dr. Smith with the amended complaint on March 4, 2008.  (Docket No. 32.)

Dr. Smith argues that plaintiff's claim is untimely because plaintiff did not serve him until five months after the amended complaint was timely filed.  He is wrong.

An action is commenced when the complaint is filed.  Fed. R. Civ. P. 3. Therefore, the action against Dr. Smith was commenced on June 4, 2007.

In addition, "If a complaint is amended to include an additional defendant after the statute of limitations has run, the amended complaint is not time barred if it 'relates back' to a timely filed complaint. <u>VKK Corp. v. National Football League</u>, 244 F.3d 114, 128 (2d Cir. 2001)

> Under Rules 15(c)(2) and (3), an amendment changing the name of a defendant relates back to the original pleading if the claims against the new party arise out of the same conduct or occurrence set forth in the original pleading, and, "within the period provided by Rule 4(m) for service of the summons and complaint," the new defendant (1) had received such notice of the action that he will not be prejudiced in maintaining his defense on the merits, and (2) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the new defendant.

<u>Vasquez v. Mill</u>, 03 Civ. 3905, 2006 WL 2789914, at *4. (S.D.N.Y. Sept. 25, 2006). The original complaint was (arguably) "filed" in January 2007 – well prior to the expiration of the statute of limitations.

In this case, plaintiff attempted to serve Dr. Smith twice. The first attempt was unsuccessful. Judge Dolinger allowed plaintiff a second chance to serve the amended complaint, and extended the time for service until February 29, 2008. Plaintiff, who is a *pro se* inmate, issued the summons within the time frame Judge Dolinger allowed— February 13, 2008. However, plaintiff had to rely on the U.S. Marshal to perfect service because of his status as a prisoner. Through circumstances beyond plaintiff's control, the U.S. Marshal did not serve Dr. Smith until five days after Judge Dolinger's deadline. There is also no evidence that Dr. Smith was prejudiced by this five day delay. Therefore, plaintiff's deficient service is excused, and the amended complaint against Dr. Smith is not barred by limitations. <u>See</u> <u>Castro v. City of New York</u>, 05 Civ. 593, 2007 WL 3071857, at **6-9 (S.D.N.Y. Oct. 10, 2007) (Dolinger, J.), <u>report and</u>

recommendation adopted in Castro v. City of New York, 05 Civ. 593, 2007 WL
3224748, at *1 (S.D.N.Y. Nov. 1, 2007) (Kaplan, J.) However, for the reasons stated
above, it fails to state any claim against Dr. Smith for deliberate indifference to his
medical condition.

Additionally, as was the case with Dr. Goulding, there is no evidence to support
any claim of indifference as against Dr. Smith.

The two actions (or inactions) to which plaintiff arguably points are Dr. Smith's
request that plaintiff be treated by only one ENT and his failure to operate on plaintiff on
June 11, 2004. But no evidence supports either allegation.

Even if there were evidence that Dr. Goulding labeled plaintiff as a
troublemaker, there is no evidence to support his allegation that Dr. Smith refused to
operate on plaintiff on June 11, 2004 for that reason. Indeed, plaintiff's medical records
contradict any suggestion that Dr. Smith was scheduled to perform surgery on plaintiff on
June 11, 2004. When plaintiff met with Dr. Smith on May 14, 2004, Dr. Smith ordered an
audiogram and CT scan, so that he could evaluate these tests in a follow up appointment
that was to be scheduled a month later. (Jiggetts Decl. Ex. N. at 534.) The undisputed
evidence reveals that the June 11th appointment was to have been the follow up
appointment at which Dr. Smith planned to review the results of the tests he had ordered
with plaintiff – it was never scheduled as a surgery, and for a variety of reasons, no
surgery could possibly have been performed on that date:

> I was never in a position to perform surgery upon him. I could not have
> done so on June 11, 2005 for a number reasons.[3] He presented for an
> office visit after having been last seen by me a month earlier. I did not

---

[3] It is undisputed that Dr. Smith last met with plaintiff on June 11, 2004. The reference to
June 11, 2005 is clearly a typographical error.

have the results of all the necessary testing (CT scans and audiogram). He had a number of different complaints that he needed to be evaluated. There was nothing in his presentation that called for his breathing problems to be addressed in a surgical approach. He had not undergone presurgical testing. In fact, surgery was never scheduled for him. In addition, it could not have been done without prior approval of the DOC.

(Smith Aff. at 6.) Clearly, the idea that plaintiff was supposed to have an operation on June 11 and that Dr. Smith refused to go through with it is pure fantasy – and is supported only by plaintiff's conclusory and unsubstantiated allegations.

Furthermore, in his notes for June 11, Dr. Smith wrote:

Patient is currently being seen by myself, Dr. Jonathan Smith, and by Dr. Lawrence Meiteles, both ENT doctors. As stated above, under reason for consult, I requested a CT scan of the maxillary sinus to evaluate for left facial pain and possible fullness of the left maxillary process around the 2nd and 1st maxillary molars on 5/14. I also requested a copy of audiogram on 5/11. I see that Dr. Meiteles has already seen the audiogram and is currently working this up; seen on 5/21/04. I think it would be best if Dr. Meiteles or I follow the patient, not both. If I am to see the patient, I would like to have the above CT scan of the maxillary sinus (similar scan also ordered of temporal bone by Dr. Meiteles), audiogram, blood work ordered on 5/21. If Dr. Meiteles is to follow patient, please provide him with this note and my other notes. Please call . . . .

(Jiggetts Decl. Ex. N. at 645.) These notes do not indicate that Dr. Smith declined to treat plaintiff; at most they suggest that Dr. Smith wanted plaintiff to work with only one ENT – a perfectly reasonable request. And as noted above, plaintiff's medical records show that he received treatment for his sinus condition, as well as other ailments, throughout his stay at Mid-Orange Correctional Facility.[4]  (See, e.g., Jiggetts Decl. Ex. N.; Dr. Jonathan Smith Mem. Ex. M.)

---

[4] On June 22, 2004, plaintiff went to sick call and complained of left groin pain. (Smith Mem. Ex. M at 142.) He was diagnosed as having a recurrent hernia. In September 2004, surgery was performed to repair the hernia. Afterward, plaintiff received physical therapy and other treatments for the hernia until March 2006. (See id. at 102, 105-06, 109-10, 125-35, 141-42, 149.)

**B.      Medical Malpractice**

Plaintiff also appears to allege a claim of medical malpractice against the defendants who performed the first three surgeries on him.  These defendants are the Albany Medical Defendants and Dr. Moscatello.  In addition, plaintiff alleges a claim of medical malpractice against Dr. Smith for refusing to perform surgery on him on June 11, 2004.

All of plaintiff's claims of medical malpractice are untimely.

In New York, the statute of limitations for a medical malpractice claim is 2 years and 6 months.  N.Y. C.P.L.R. 214-a (McKinney 2009); Gordon v. Magun, 83 N.Y.2d 881, 883 (1994).  "A cause of action for medical malpractice typically accrues on the date the act, omission or failure to act occurs, except where there is a continuous treatment related to the original condition or complaint, in which case the statute of limitations is tolled during the course of that treatment.  Milano by Milano v. Freed, 767 F. Supp. 450, 454-55 (E.D.N.Y. 1991) (quotation omitted).  The continuous treatment doctrine applies when the doctor's treatment was part of that doctor's "continuing effort[] . . . to treat a particular condition."  Gordon, 93 N.Y.2D at 883 (quotation omitted).  In other words, the statute of limitations for medical malpractice is tolled against a single doctor until the last date that doctor treated the plaintiff for the same condition.

The statute of limitations for plaintiffs' medical malpractice claims has run.  The last day Dr. Silver treated plaintiff was on December 6, 2001.  Drs. Lam and Putnam last treated plaintiff on March 29, 2002.  Dr. Moscatello last treated plaintiff on August 25, 2003.  June 11, 2004, was the day plaintiff was not operated on by Dr. Smith.  Under the

statute of limitations for a medical malpractice claim, the last day plaintiff could file a claim against: (1) Dr. Silver was June 6, 2004; (2) Drs. Lam and Putnam was September 29, 2004; (3) Dr. Moscatello was February 25, 2006; and (4) Dr. Smith was December 11, 2006.  Plaintiff brought this lawsuit in January (or later) 2007. As a result, his state law claims for medical malpractice claims are time-barred.

## III.     Plaintiff's Claim Against Dr. Wright

Dr. Wright is named as a defendant in this action because he is the Chief Medical Officer of DOCS Health Services.  Plaintiff testified that he sued Dr. Wright because, "he's responsible for our health, for the health of the inmates.  He's in Albany and he's the head.  Thus he cannot ignore me and that's why I made a complaint against him." (Snyder Aff. Ex. L at 50:25-51:5.)  On two occasions, plaintiff wrote to Dr. Wright to complain about the medical care he was receiving.  Plaintiff alleges that Dr. Wright failed to adequately respond to those letters.  Thus, plaintiff's theory of section 1983 liability is that Dr. Wright failed to act on information showing that a constitutional violation was occurring.

The dismissal of the Section 1983 claims against the defendants actually involved in plaintiff's ongoing medical care mandates dismissal of the supervisory liability claim against Dr. Wright as well. Additionally, "To establish the liability of a supervisory official under § 1983, a plaintiff must show the defendant's personal involvement in the alleged constitutional violations." Richardson v. Goord, 347 F.3d 431, 435 (2d Cir. 2003).  "In other words, a plaintiff must show personal involvement on the part of the supervisor in the alleged constitutional violations to maintain a cause of action; 'linkage in the prison chain of command' is not sufficient to implicate a commissioner or prison

superintendent." <u>Kemp v. Wright</u>, 01 Civ. 562, 2005 WL 893571, at *7 (E.D.N.Y. Apr.

19, 2005) (<u>quoting</u> <u>Richardson</u>, 347 F.3d at 435). There is no evidence in the record to

support a claim of supervisory liability -- even if there were liability on the part of any of

the other defendants, which there is not.

A plaintiff may establish a supervisor's personal involvement in one of five ways:

(1) the defendant participated directly in the alleged constitutional violation; (2) the

defendant, after being informed of the violation through a report or appeal, failed to

remedy the wrong; (3) the defendant created a policy or custom under which

unconstitutional practices occurred, or allowed the continuance of such a policy or

custom; (4) the defendant was grossly negligent in supervising subordinates who

committed the wrongful acts; or (5) the defendant exhibited deliberate indifference to the

rights of inmates by failing to act on information indicating that unconstitutional acts

were occurring. <u>Colon v. Coughlin</u>, 58 F.3d 865, 873 (2d Cir. 1995); <u>Kemp</u>, 2005 WL

893571, at *7.

On October 15, 2003, plaintiff sent a letter to Dr. Wright asking that he direct the

medical personnel at Mid-Orange Correctional Facility to arrange an appointment for a

specialist, so that plaintiff could have the sutures in his nose removed. On October 29,

2003, a member of Dr. Wright's staff responded to plaintiff's letter: "I have been

informed that a consult has been submitted by your primary care provider for your follow

up visit to the ENT specialist. During this visit, the specialist will determine when the

sutures will be removed." Subsequently, plaintiff saw a specialist who removed the

sutures.

On November 7, 2006, plaintiff explained that he was writing Dr. Wright to complain about the "botched surgical procedure" plaintiff received on December 6, 2001. In that letter, plaintiff complains that he was wrongly labeled a troublemaker and that he was denied medical treatment. On December 6, 2006, a member of Dr. Wright's staff responded to plaintiff's complaint: "You have been seen and evaluated by the facility physician, who has referred you for diagnostic evaluative tests and to a consultant specialist. As soon as the results of the diagnostic test are reviewed, they will determine the need for the specialist. It appears that your medical needs are getting appropriate attention." On March 21, 2007, plaintiff underwent a fourth surgery on his nose, which has purportedly corrected his sinus problems.

Even if there had been a constitutional violation here, plaintiff's evidence falls short of showing Dr. Wright was personally involved in it. The mere receipt of two letters from an inmate is insufficient to show the requisite personal involvement for a section 1983 claim. Sealey, 116 F.3d at 51.

In Sealey, the Second Circuit affirmed the dismissal of a claim against the former commissioner of DOCS. Plaintiff had written two letters to the commissioner to complain about due process violations surrounding his confinement to the Special Housing Unit. In the first letter, the commissioner referred the matter to one of his subordinates for decision. Plaintiff's second letter was a status inquiry about his complaint. The commissioner responded to that letter by informing plaintiff that the subordinate had rendered a decision. The Second Circuit held that "[plaintiff's] letters and [commissioner's] response do not demonstrate the requisite personal involvement on [commissioner's] part . . . ." Id.

41

## Conclusion

As all of plaintiff's claims against all defendants fail as a matter of law, the court declines to address defendants' other arguments for summary judgment, including collateral estoppel, sovereign immunity (insofar as the State defendants are sued in their official capacities) and qualified immunity.

For the foregoing reasons, State Defendants', Albany Medical Defendants', Dr. Moscatello's and Dr. Smith's motions for summary judgment are granted.  (See Docket Nos. 64, 86, 91 and 92.)  The Clerk of the Court is directed to enter judgment for defendants and to close the file in this matter.

This constitutes the decision and order of the Court.

Dated: September 29, 2009

U.S.D.J.

BY FIRST CLASS MAIL TO PLAINTIFF

Wilfredo Gonzalez
( # 83-A-5986)
Woodbourne Correctional Facility
99 Prison Road
P.O. Box 1000
Woodbourne, NY 12788
PRO SE

BY ECF TO COUNSEL FOR ALL DEFENDANTS